# AMERICAN TRUCKING ASSOCIATIONS, INC., ET AL. *v.* SMITH, DIRECTOR, ARKANSAS HIGHWAY AND TRANSPORTATION DEPARTMENT, ET AL.

No. 88–325.   Argued March 22, 1989—Reargued December 6, 1989—Decided June 4, 1990

168

O'CONNOR, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and WHITE and KENNEDY, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 200. STEVENS, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 205.

*Andrew L. Frey* reargued the cause for petitioners. With him on the briefs were *Kenneth S. Geller, Mark I. Levy, Andrew J. Pincus, Peter G. Kumpe, Daniel R. Barney, Robert Digges, Jr., Laurie T. Baulig,* and *William S. Busker.*

*A. Raymond Randolph* reargued the cause for respondents. With him on the briefs were *Daniel I. Prywes, Bruce R. Stewart, Herschel H. Friday, B. S. Clark, Robert S. Shafer, Robert L. Wilson, A. T. Goodloe II,* and *Christopher O. Parker.**

---

*Briefs of *amici curiae* urging reversal were filed for the Crow Tribe of Indians by *Daniel M. Rosenfelt;* for the Committee on State Taxation of the Council of State Chambers of Commerce by *Jean A. Walker* and *William D. Peltz;* for the National Private Truck Council, Inc., by *Richard A. Allen* and *Robert A. Hirsch;* and for the Tax Executives Institute, Inc., by *Timothy J. McCormally.*

Briefs of *amici curiae* urging affirmance were filed for the Commonwealth of Pennsylvania et al. by *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *Bryan E. Barbin,* Deputy Attorney General, *John G. Knorr*

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE KENNEDY join.

In this case we decide whether our decision in *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266 (1987), applies retroactively to taxation of highway use prior to the date of that decision.

## I

In 1983 petitioners brought suit in the Chancery Court of Pulaski County, Arkansas, challenging the constitutionality of the newly enacted Arkansas Highway Use Equalization Tax Act (HUE), 1983 Ark. Gen. Acts, No. 685, Ark. Code Ann. §§ 27-35-204, 27-35-205 (1987) (formerly codified as Ark. Stat. Ann. §§ 75-817.2, 75-817.3 (Supp. 1985)), under the Commerce Clause of the Federal Constitution, Art. I, § 8, cl. 3. The HUE tax required trucks operating on Arkansas

---

*III*, Chief Deputy Attorney General, and *Louis J. Rovelli*, Executive Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Douglas B. Baily* of Alaska, *Duane Woodard* of Colorado, *Linley E. Pearson* of Indiana, *J. Joseph Curran, Jr.*, of Maryland, *Hubert H. Humphrey III* of Minnesota, *Robert M. Spire* of Nebraska, *Brian McKay* of Nevada, *James E. O'Neil* of Rhode Island, and *Joseph B. Meyer* of Wyoming; and for the National Conference of State Legislatures et al. by *Benna Ruth Solomon* and *Charles Rothfeld*.

Briefs of *amici curiae* were filed for the State of California et al. by *John K. Van de Kamp*, Attorney General of California, and *Richard F. Finn*, Supervising Deputy Attorney General, *Eric J. Coffill*, *Jim Jones*, Attorney General of Idaho, *Marc Racicot*, Attorney General of Montana, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Jim Mattox*, Attorney General of Texas, and *Paul Van Dam*, Attorney General of Utah; for the State of Vermont et al. by *Jeffrey L. Amestoy*, Attorney General of Vermont, and *Thomas R. Viall*, Assistant Attorney General, *Peter N. Perretti, Jr.*, Attorney General of New Jersey, and *Mary R. Hamill*, Deputy Attorney General, *Clarine Nardi Riddle*, Acting Attorney General of Connecticut, and *Jane D. Comerford*, Assistant Attorney General; and for the Transportation Cabinet of the Commonwealth of Kentucky by *Frederic Cowan*, Attorney General of Kentucky, *A. Stephen Reeder*, Special Assistant Attorney General, and *Patricia K. Foley*.

highways with a gross weight between 73,281 and 80,000 pounds to pay, alternatively, an annual flat tax of $175 or a tax of 5¢ per mile traveled in Arkansas or a trip permit fee of $8 per 100 miles. Effectively, HUE taxed only the first 3,500 miles of annual highway use by heavy trucks, that being the point at which it became advantageous to pay the flat tax of $175. Because trucks based in Arkansas were likely to travel many more miles on the State's highways than heavy trucks based out of the State, petitioners argued that HUE impermissibly discriminated against interstate commerce by imposing on out-of-state truckers greater per-mile costs than those imposed on in-state truckers. To remedy the alleged federal constitutional violation petitioners argued that Art. 16, § 13, of the Arkansas Constitution required the State to refund all HUE taxes petitioners had paid. See App. 12–13, 22–23 (filed Mar. 6, 1989).

Pending determination on the merits of their constitutional challenge, petitioners sought a preliminary injunction placing all HUE tax revenues in escrow to prevent those revenues from being deposited into the state treasury and being distributed to state agencies. The Chancery Court's denial of petitioners' motion for the preliminary injunction was affirmed on interlocutory appeal to the Arkansas Supreme Court. *American Trucking Assns., Inc.* v. *Gray*, 280 Ark. 258, 657 S. W. 2d 207 (1983). After further proceedings, the Chancery Court upheld the constitutionality of HUE, and the State Supreme Court affirmed. *American Trucking Assns., Inc.* v. *Gray*, 288 Ark. 488, 707 S. W. 2d 759 (1986). That court relied on our decisions in *Capitol Greyhound Lines* v. *Brice*, 339 U. S. 542 (1950), *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs of Mont.*, 332 U. S. 495 (1947), and *Aero Mayflower Transit Co.* v. *Georgia Public Service Comm'n*, 295 U. S. 285 (1935), to hold that the flat tax portion of HUE was neither excessive nor unreasonable and did not, therefore, violate the Commerce Clause. In so doing, the Arkansas Supreme Court explicitly rejected peti-

tioners' argument that our decision in *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977), had overruled the *Aero Mayflower* line of cases.

Petitioners appealed the Arkansas Supreme Court decision to this Court, and we held the case pending our decision in *Scheiner*, which involved a similar constitutional challenge to two flat highway use taxes enacted by the Commonwealth of Pennsylvania. In *Scheiner*, decided June 23, 1987, the Court held that unapportioned flat taxes such as those imposed by Pennsylvania penalize travel within a free trade area among the States. The Court applied the "internal consistency" test, see *Armco Inc.* v. *Hardesty*, 467 U. S. 638, 644 (1984), and concluded that "[i]f each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred." 483 U. S., at 284. We recognized in *Scheiner* that Arkansas, appearing as *amicus curiae* in that case, was one of a number of States that had enacted flat highway use taxes. See *id.*, at 285, n. 17; *id.*, at 300–301 (O'CONNOR, J., dissenting). Accordingly, three days after deciding *Scheiner*, we vacated the judgment of the Arkansas Supreme Court in *Gray* and remanded that case for further consideration in light of *Scheiner*. *American Trucking Assns., Inc.* v. *Gray*, 483 U. S. 1014 (1987). On motion by petitioners, who sought to expedite their efforts in the state courts to obtain injunctive relief against further enforcement of the HUE tax, and pursuant to this Court's former Rule 52.2, JUSTICE BLACKMUN shortened the time of issuance of our mandate to the Arkansas Supreme Court and ordered that the mandate issue on July 16, 1987.

Petitioners thereupon sought to enjoin further collection of the HUE tax or to order an escrow of the taxes to be collected pending reconsideration of *Gray* by the Arkansas Supreme Court. Motions seeking to accomplish this end were denied by that court, and petitioners returned here. In an opinion issued August 14, 1987, JUSTICE BLACKMUN, acting

as Circuit Justice, concluded there was a significant possibility that the Arkansas Supreme Court would find the HUE tax unconstitutional under *Scheiner* or, failing that, that this Court would note probable jurisdiction and strike down the HUE tax. *American Trucking Assns., Inc.* v. *Gray*, 483 U. S. 1306, 1309 (in chambers). He further concluded that, because "there is a substantial risk that [petitioners] will not be able to obtain a refund if the [HUE] tax ultimately is declared unconstitutional," *ibid.*, petitioners would suffer "irreparable injury absent injunctive relief." *Ibid.* JUSTICE BLACKMUN therefore ordered Arkansas to "escrow the HUE taxes to be collected, until a final decision on the merits in this case is reached." *Id.*, at 1310.

On October 9, 1987, the Arkansas Legislature met in special session, repealed the HUE tax, and replaced it with a tax requiring heavy trucks to pay 2.5¢ per mile of travel on Arkansas highways. See Ark. Code Ann. §§ 27–35–204, 27–35–205 (1987). Subsequently, in an opinion delivered on March 14, 1988, the Arkansas Supreme Court reconsidered the HUE tax in light of *Scheiner* and ruled it unconstitutional. *American Trucking Assns., Inc.* v. *Gray*, 295 Ark. 43, 746 S. W. 2d 377. The court, however, declined to order tax refunds to petitioners for all HUE taxes paid prior to JUSTICE BLACKMUN's August 14, 1987, escrow order. The Arkansas Supreme Court reasoned that petitioners would be entitled to refunds of all their HUE tax payments only if that court were to apply our *Scheiner* decision retroactively. In order to determine whether it would so treat *Scheiner*, the State Supreme Court applied the three-factor test we enunciated in *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971).

First, the Arkansas court ruled that *Scheiner* established a new rule of law with respect to flat highway use taxes by overruling the *Aero Mayflower* line of cases. The Arkansas court concluded that it reasonably relied on those cases in originally upholding the HUE tax against petitioners' Commerce Clause challenge. Second, the court held that pro-

spective application of *Scheiner* would effectuate the purpose of the Commerce Clause "to secure equal treatment for inter- and intrastate commerce and thus create an area of free trade among the states." 295 Ark., at 46, 746 S. W. 2d, at 379. In this regard, the Arkansas Supreme Court relied heavily on the decision of the Washington Supreme Court denying tax refunds because of its determination that our decision in *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232 (1987), should not be applied retroactively. See *National Can Corp.* v. *Department of Revenue*, 109 Wash. 2d 878, 888, 749 P. 2d 1286, 1291 (1988) (en banc) ("It is difficult to understand how retroactive application would encourage free trade among the states since whatever chill was imposed on interstate trade is in the past"), app. dism'd, 486 U. S. 1040 (1988). Third, the Arkansas Supreme Court held that it would be inequitable to order a total refund of HUE taxes already paid by petitioners into the state treasury. The court reasoned that because petitioners had driven their heavy trucks on Arkansas highways, a total refund would "allow them an unconscionable windfall far in excess of a fair recovery for the discrimination they may have suffered due to the tax. It would constitute unfair treatment of the Arkansas-based truckers who have paid the tax and seek no refund." 295 Ark., at 47, 746 S. W. 2d, at 379. The Arkansas court determined, however, that HUE tax money paid into escrow after JUSTICE BLACKMUN's August 14, 1987, order should be refunded to petitioners as that money, having not been placed into the state treasury, had not been spent or budgeted for future expenditure. Justice Hickman dissented, believing that petitioners were entitled to refunds from the date *Scheiner* was decided "or certainly no later than when we were asked, in July 1987, to place the funds in escrow." 295 Ark., at 47, 746 S. W. 2d, at 379. On petition for rehearing, petitioners modified their remedial request and urged the Arkansas court to refund HUE taxes paid in

excess of taxes petitioners would have paid had they been based in the State. The petition for rehearing was denied.

Petitioners thereupon sought a writ of certiorari from this Court. They presented the questions whether *Scheiner* should be applied retroactively and whether, even if the *Scheiner* decision is not retroactive, they are still entitled to refunds for taxes paid before we decided *Scheiner* for the tax year that began after the *Scheiner* decision or to refunds for taxes paid after the *Scheiner* decision but before JUSTICE BLACKMUN's escrow order. We granted the petition for certiorari, 488 U. S. 954 (1988), and consolidated the case with No. 88–192, *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Fla.*, which we also decide today. See *ante*, p. 18. We now affirm in part, reverse in part, and remand for further consideration.

## II

When we have held state taxes unconstitutional in the past it has been our practice to abstain from deciding the remedial effects of such a holding. While the relief provided by the State must be in accord with federal constitutional requirements, see *McKesson, ante*, at 36–43, 51–52, we have entrusted state courts with the initial duty of determining appropriate relief. See, *e. g., Scheiner*, 483 U. S., at 297–298; *Tyler Pipe, supra*, at 251–253; *Williams* v. *Vermont*, 472 U. S. 14, 28 (1985); *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 276–277 (1984); *Exxon Corp.* v. *Eagerton*, 462 U. S. 176, 196–197 (1983). Our reasons for doing so have arisen from a perception based in considerations of federal-state comity:

> "[T]his Court should not take it upon itself in this complex area of state tax structures to determine how to apply its holding:
>
> "'These refund issues, which are essentially issues of remedy for the imposition of a tax that unconstitutionally discriminated against interstate commerce, were not addressed by the state courts. Also, the federal constitu-

"tional issues involved may well be intertwined with, or their consideration obviated by, issues of state law. Also, resolution of those issues, if required at all, may necessitate more of a record than so far has been made in this case. We are reluctant, therefore, to address them in the first instance.'" *Tyler Pipe, supra,* at 252, quoting *Bacchus, supra,* at 277.

In a case such as this, where a state court has addressed the refund issues, the same comity-based perception that has dictated abstention in the first instance requires that we carefully disentangle issues of federal law from those of state law and refrain from deciding anything apart from questions of federal law directly presented to us. By these means we avoid interpreting state laws with which we are generally unfamiliar and deciding additional questions of federal law unnecessarily. Cf. *Michigan* v. *Long,* 463 U. S. 1032, 1039–1042 (1983). In the present case, it is eminently clear that the "state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law . . . ." *Id.,* at 1040. Specifically, the Arkansas Supreme Court took the view that, whatever else Arkansas law might require, petitioners could not receive tax refunds if *Scheiner* is not retroactive under the test of *Chevron Oil.*

The determination whether a constitutional decision of this Court is retroactive—that is, whether the decision applies to conduct or events that occurred before the date of the decision—is a matter of federal law. When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions. See *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.,* 287 U. S. 358, 364 (1932) ("We think the federal constitution has no voice upon the subject [of whether a state court may decline to give its decisions retroactive effect]"). The retroactive applicability of a constitutional decision of this Court, however, "is every bit as much of a federal question as what particular federal constitutional provisions themselves mean,

what they guarantee, and whether they have been denied." *Chapman* v. *California*, 386 U. S. 18, 21 (1967). In order to ensure the uniform application of decisions construing constitutional requirements and to prevent States from denying or curtailing federally protected rights, we have consistently required that state courts adhere to our retroactivity decisions. See, *e. g.*, *Michigan* v. *Payne*, 412 U. S. 47 (1973) (holding that the state court erred in applying *North Carolina* v. *Pearce*, 395 U. S. 711 (1969), retroactively to invalidate a resentencing proceeding occurring prior to the date of the decision in *Pearce*); *Arsenault* v. *Massachusetts*, 393 U. S. 5 (1968) (holding that the state court erred in determining that *White* v. *Maryland*, 373 U. S. 59 (1963), requiring an accused to be represented by counsel during a preliminary hearing, did not apply retroactively to petitioner).

Although the Court has recently determined that new rules of criminal procedure must be applied retroactively to all cases pending on direct review or not yet final, see *Griffith* v. *Kentucky*, 479 U. S. 314, 328 (1987), retroactivity of decisions in the civil context "continues to be governed by the standard announced in *[Chevron Oil]*," *id.*, at 322, n. 8; see also *United States* v. *Johnson*, 457 U. S. 537, 550, n. 12 (1982). In this case, the Arkansas Supreme Court decided that under *Chevron Oil* our decision in *Scheiner* need only apply prospectively. This decision presents a federal question: Did the Arkansas Supreme Court apply *Chevron Oil* correctly? As petitioners properly observed at oral argument, this is the only question before the Court in this case. Tr. of Oral Rearg. 7–10.

It is important to distinguish the question of retroactivity at issue in this case from the distinct remedial question at issue in *McKesson, ante*, p. 18: When taxpayers involuntarily pay a tax that is unconstitutional under existing precedents, to what relief are those affected taxpayers entitled as a matter of federal law? Our decision in *McKesson* indicates that federal law sets certain minimum requirements that States

must meet but may exceed in providing appropriate relief. Because we decide that, in certain respects, the Arkansas Supreme Court misapplied *Chevron Oil* and, therefore, that our decision in *Scheiner* applies to some taxation of highway use pursuant to the HUE tax, we must remand this case to the Arkansas Supreme Court to determine appropriate relief in light of *McKesson*.

A

Using the *Chevron Oil* test, we consider first the application of *Scheiner* to taxation of highway use prior to June 23, 1987, the date we decided *Scheiner*, for the HUE tax year ending June 30, 1987. That test has three parts:

"First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, . . . we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. Finally, we [must] weig[h] the inequity imposed by retroactive application, for where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice or hardship by a holding of nonretroactivity." 404 U. S., at 106–107 (citations and internal quotations omitted).

We think it obvious that *Scheiner* meets the first test of nonretroactivity. Both the majority and dissent in that case recognized that the Court's decision left very little of the *Aero Mayflower* line of precedents standing. As the majority observed, "the precedents upholding flat taxes can no longer support the broad proposition . . . that every flat tax for the privilege of using a State's highways must be upheld even if it has a clearly discriminatory effect on commerce by

reason of that commerce's interstate character." 483 U. S.,
at 296. These precedents retain vitality only when flat taxes
"are the only practicable means of collecting revenues from
users," *ibid.* — a situation no more present in Arkansas than it
was in Pennsylvania. See also *id.*, at 298 (O'CONNOR, J.,
dissenting) ("[T]he Court today directly overrules the hold-
ings of" the *Aero Mayflower* precedents); *id.*, at 304 (SCALIA,
J., dissenting). That the Court in *Scheiner* recognized that
*Complete Auto Transit* "called into question the future vital-
ity of earlier cases that had upheld facially neutral flat taxes,"
483 U. S., at 295, does not alter our conclusion. As we ob-
served last Term, "[i]f a precedent of this Court has direct
application in a case, yet appears to rest on reasons rejected
in some other line of decisions, the [lower courts] should fol-
low the case which directly controls, leaving to this Court the
prerogative of overruling its own decisions." *Rodriguez de
Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477,
484 (1989). This is precisely what the State of Arkansas ar-
gued and what the Arkansas Supreme Court did in its origi-
nal decision holding the HUE tax constitutional. Moreover,
that court noted with reliance that we cited the *Aero May-
flower* cases with approval in *Massachusetts* v. *United
States*, 435 U. S. 444, 463–464 (1978), one year after we de-
cided *Complete Auto Transit*. 288 Ark., at 497, 707 S. W.
2d, at 762–763. The Arkansas Supreme Court correctly con-
cluded that *Scheiner* established a "new principle of law" by
overruling those aspects of the *Aero Mayflower* cases on
which the State of Arkansas relied in enacting and assessing
the HUE tax.

The conclusion that *Scheiner* established a new principle
of law in the area of our dormant Commerce Clause juris-
prudence does not necessarily end the inquiry. See *Florida*
v. *Long*, 487 U. S. 223, 230 (1988); *Arizona Governing Comm.
for Tax Deferred Annuity and Deferred Compensation Plans*
v. *Norris*, 463 U. S. 1073, 1109–1110 (1983) (O'CONNOR, J.,
concurring). It is equally clear to us, however, that the pur-

pose of the Commerce Clause does not dictate retroactive application of *Scheiner* and that equitable considerations tilt the balance toward nonretroactive application. We observed in *Scheiner* that the Commerce Clause "'by its own force created an area of trade free from interference by the States.'" 483 U. S., at 280, quoting *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 328 (1977). Petitioners argue that the retroactive application of *Scheiner* will tend to deter future free trade violations which the several States have strong parochial incentives to commit. As we have just discussed, however, the HUE tax was entirely consistent with the *Aero Mayflower* line of cases, and it is not the purpose of the Commerce Clause to prevent legitimate state taxation of interstate commerce. See *Complete Auto Transit*, 430 U. S., at 288.

Finally, under the third prong of the *Chevron Oil* test, we consider the equities of retroactive application of *Scheiner*. Our decision today in *McKesson* makes clear that once a State's tax statute is held invalid under the Commerce Clause, the State is obligated to provide relief consistent with federal due process principles. See *ante*, at 36–43. When the State comes under such a constitutional obligation, *McKesson* establishes that equitable considerations play only the most limited role in delineating the scope of that relief. *Ante*, at 44–51. Of course, we had no occasion to consider the equities of *retroactive* application of new law in *McKesson* because that case involved only the application of settled Commerce Clause precedent. See *ante*, at 31, n. 15. In light of *McKesson*'s holding that a ruling that a tax is unconstitutionally discriminatory under the Commerce Clause places substantial obligations on the States to provide relief, the threshold determination whether a new decision should apply retroactively is a crucial one, requiring a hard look at whether retroactive application would be unjust. At this initial stage, the question is not whether equitable considerations outweigh the obligation to provide relief for a

182

constitutional violation, cf. *ante*, at 44–45, 50, but whether there is a constitutional violation in the first place.

A careful consideration of the equities persuades us that *Scheiner* should not apply retroactively. Unlike *McKesson*, where the State enacted a tax scheme that "was virtually identical to the Hawaii scheme invalidated in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984)," *ante*, at 46, and thus the State could "hardly claim surprise at the Florida courts' invalidation of the scheme," *ibid.*, here the State promulgated and implemented its tax scheme in reliance on the *Aero Mayflower* precedents of this Court. In light of these precedents, legislators would have good reason to suppose that enactment of the HUE tax would not violate their oath to uphold the United States Constitution, and the State Supreme Court would have every reason to consider itself bound by those precedents to uphold the tax against a constitutional challenge. Similarly, state tax collection authorities would have been justified in relying on state enactments valid under then-current precedents of this Court, particularly where, as here, the enactments were upheld by the State's highest court.

Where a State can easily foresee the invalidation of its tax statutes, its reliance interests may merit little concern, see *McKesson*, *ante*, at 44–46, 50. By contrast, because the State cannot be expected to foresee that a decision of this Court would overturn established precedents, the inequity of unsettling actions taken in reliance on those precedents is apparent. Although at this point the burden that the retroactive application of *Scheiner* would place on Arkansas cannot be precisely determined, it is clear that the invalidation of the State's HUE tax would have potentially disruptive consequences for the State and its citizens. A refund, if required by state or federal law, could deplete the state treasury, thus threatening the State's current operations and future plans. Presumably, under *McKesson*, the State would be required to calculate and refund that portion of the tax that would be

found under *Scheiner* to discriminate against interstate commerce, with the attendant potentially significant administrative costs that would entail. As *McKesson* makes clear, the State could also attempt to provide relief by retroactively increasing taxes on the favored taxpayers to cure any violation. But this too would entail substantial administrative costs and could at some point run into independent constitutional restrictions. See *ante*, at 40, n. 23 ("[B]eyond some temporal point the retroactive imposition of a significant tax burden may be 'so harsh and oppressive as to transgress the constitutional limitation'"). Moreover, such an approach would unfairly penalize favored taxpayers for the State's failure to foresee that this Court would overrule established precedent. Although *in the future* States may be able to protect their fiscal stability by imposing procedural requirements on taxpayer actions, see *McKesson*, *ante*, at 45, 50, such prospective safeguards do not affect the inequities of retroactive application of *Scheiner*. Nor can Arkansas be faulted for continuing to rely on its statute after its highest state court upheld the constitutionality of the tax.

In sum, we conclude that applying *Scheiner* retroactively would "produce substantial inequitable results." *Chevron Oil*, 404 U. S., at 107. The invalidation of the HUE tax has the potential for severely burdening the State's operations. That burden may be largely irrelevant when a State violates constitutional norms well established under existing precedent. See *McKesson*. But we think it unjust to impose this burden when the State relied on valid, existing precedent in enacting and implementing its tax. Accordingly, we conclude that *Scheiner* does not apply to HUE taxation for highway use prior to June 23, 1987, for the HUE tax year ending June 30, 1987.[1]

---

[1] JUSTICE SCALIA indicates that the inequitable effects of retroactively applying *Scheiner* are a sign that our dormant Commerce Clause doctrine is "inherently unstable" and should not be applied to "new matters coming before us," *post*, at 203–204, rather than a factor weighing in favor of

The dissent suggests that federal courts should weigh equitable considerations only in determining the scope of relief a federal court should award. This is precisely backwards. As previously discussed, *McKesson* makes plain that equitable considerations are of limited significance once a constitutional violation is found. As the dissent's analysis ultimately makes clear, see, *e. g., post*, at 218–219, n. 8, 224, its suggested approach would effectively eliminate consideration of the equities entirely in a case such as this, when the judicial decision invalidating the State's taxation scheme represented a clear break from prior precedent. This is inconsistent with our nonretroactivity doctrine and would work real and inequitable hardships in many cases.

Petitioners further argue that the equities always favor applying decisions retroactively when those decisions would burden only a governmental entity. They rely on *Owen* v. *City of Independence*, 445 U. S. 622, 651 (1980), for the proposition that local governments should not be permitted to "disavow liability for the injury [they have] begotten." *Owen* is not applicable to our considerations here. That case only addressed the question whether Congress intended a municipality to have good faith immunity from actions brought under 42 U. S. C. § 1983. Our decision in *Owen* simply construed that statute through a consideration of its legislative history and the immunity traditionally accorded municipalities in 1871, when the forerunner of § 1983 was enacted. 445 U. S., at 635–650. Our delineation of the scope of liability under a statute designed to permit suit against governmental entities and officials provides little guidance for determining the fairest way to apply our own decisions. Indeed,

nonretroactivity. As the parties do not raise, and this case does not present, any question regarding the continued vitality of our dormant Commerce Clause jurisprudence, which the Court has developed and applied for nearly a century and a half, see *Cooley* v. *Board of Wardens of Port of Philadelphia*, 12 How. 299 (1852), we decline to address that suggestion here.

the policy concerns involved are quite distinct. In *Owen*, we discerned that according municipalities a special immunity from liability for violations of constitutional rights would not best serve the goals of § 1983, even if those rights had not been clearly established when the violation occurred. Such a determination merely makes municipalities, like private individuals, responsible for anticipating developments in the law. We noted that such liability would motivate each of the city's elected officials to "consider whether his decision comports with constitutional mandates and . . . weigh the risk that a violation might result in an award of damages from the public treasury." *Id.*, at 656. This analysis does not apply when a decision clearly breaks with precedent, a type of departure which, by definition, public officials could not anticipate nor have any responsibility to anticipate. See *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S., at 485.

In determining whether a decision should be applied retroactively, this Court has consistently given great weight to the reliance interests of all parties affected by changes in the law. See, *e. g.*, *Cipriano* v. *City of Houma*, 395 U. S. 701, 706 (1969) ("Significant hardships would be imposed on cities, bondholders, and other connected with municipal utilities if our decision today were given full retroactive effect"). To the extent that retrospective application of a decision burdens a government's ability to plan or carry out its programs, the application injures all of the government's constituents. These concerns have long informed the Court's retroactivity decisions. The Court has used the technique of prospective overruling (accompanied by a stay of judgment) to avoid disabling Congress' bankruptcy scheme, see, *e. g.*, *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 88 (1982), and has refused to invalidate retrospectively the administrative actions and decisions of the Federal Election Commission, see *Buckley* v. *Valeo*, 424 U. S. 1, 142–143 (1976). The Court has also declined to provide

retrospective remedies which would substantially disrupt governmental programs and functions. See, *e. g.*, *Lemon* v. *Kurtzman,* 411 U. S. 192, 209 (1973) *(Lemon II)* ("[S]tate officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful") (plurality opinion); see also *Reynolds* v. *Sims,* 377 U. S. 533, 585 (1964) ("[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid"); *Allen* v. *State Bd. of Elections,* 393 U. S. 544 (1969). The retrospective invalidation of a state tax that had been lawful under then-current precedents of this Court threatens a similar disruption of governmental operations. Therefore, our refusal here to retroactively invalidate legislation that was lawful when enacted is in accord with our previous determinations of how best to give effect to new constitutional decisions.

## B

Before and after the date of our *Scheiner* decision, some petitioners paid HUE taxes for the tax year beginning July 1, 1987. The Arkansas Supreme Court ruled that the State's collection of these payments was constitutional until the date of JUSTICE BLACKMUN's escrow order. It therefore declined to order refunds for any 1987–1988 HUE taxes not paid into escrow. Petitioners argue that they are entitled to refunds of these payments even if *Scheiner* is not to be applied retroactively because these HUE tax payments were made to secure the privilege of driving heavy trucks on Arkansas highways between July 1, 1987, and June 30, 1988. Petitioners argue that the question whether *Scheiner* applies to the collection of 1987–1988 HUE taxes should depend on the "occurrence of the taxed transaction or the enjoyment of the taxed

benefit, not the remittance of the tax." Brief for Petitioners 47 (filed Jan. 18, 1989). Otherwise, petitioners contend, similarly situated 1987–1988 HUE taxpayers will receive different remedies depending solely and fortuitously on the date the individual taxpayers remitted the tax. We agree.

It is, of course, a fundamental tenet of our retroactivity doctrine that the prospective application of a new principle of law begins on the date of the decision announcing the principle. See, *e. g.*, *Florida* v. *Long*, 487 U. S., at 237–238; *Norris*, 463 U. S., at 1111 (O'CONNOR, J., concurring); *Lemon II, supra; Chevron Oil*, 404 U. S., at 99; *Phoenix* v. *Kolodziejski*, 399 U. S. 204, 214 (1970). This tenet of retroactivity, however, does not define the conduct to which *Scheiner* prospectively applies: Does it apply to the flat taxing of highway use or to the *collection* of taxes for highway use after the date of that decision? We think it apparent that *Scheiner* applies to the flat taxation of highway use after the date of that decision. This is true regardless of when the taxes for such use were actually collected. If Arkansas had collected HUE-like taxes for highway use occurring *before* the required tax payment date, a prospective decision of this Court that such taxes were unconstitutional would not preclude the State from collecting, *after* the date of that decision, taxes for highway use that occurred *before* the decision was announced. The very same principle applies where, as here, the converse is true. Because we hold *Scheiner* to apply only prospectively, flat highway taxation was permissible for highway use that occurred before the date of our decision but not after. A contrary rule would give States a perverse incentive to collect taxes far in advance of the occurrence of the taxable transaction. It would also penalize States that do not immediately collect taxes, but nevertheless plan their operations on the assumption that they will ultimately collect taxes that have accrued. In this case, the taxpayer is advantaged in the sense that certain of its tax payments were made under an unconstitutional statute and

remedies may be in order; in the hypothetical converse case, the State is advantaged in the sense that it may continue to collect taxes after the date of our decision finding its tax to be prospectively unconstitutional. In both cases, as petitioners correctly note, the critical event for prospectivity is "the occurrence of the underlying transaction, and not the payment of money therefor . . . ." Brief for Petitioners 47 (filed Jan. 18, 1989). Cf. *Lemon II, supra.*

Thus petitioners are correct that those HUE taxes paid to the State for the 1987–1988 tax year, regardless of whether they were paid before or after we announced *Scheiner*, are not protected by the conclusion that *Scheiner* applies only prospectively. In this regard, the Arkansas Supreme Court's holding that petitioners were not entitled to refunds for the 1987–1988 HUE taxes they paid arose from a misapplication of *Chevron Oil*. From the face of the State Supreme Court's opinion we can discern no reason apart from this misapprehension of the force of *Chevron Oil* that caused it to deny petitioners' request for 1987–1988 HUE tax refunds. Accordingly, this aspect of the Arkansas Supreme Court's opinion must be reversed.

## III

The dissent claims that our decision today treats the petitioners in this case less favorably than the taxpayers in *Scheiner, post,* at 211–212, and challenges our retroactivity doctrine as fundamentally inequitable. The dissent asserts that not only does judicial integrity require the Court to apply new decisions to all cases pending on direct review, but also that we have consistently followed this practice in civil cases raising constitutional claims. *Post,* at 212–218. The dissent further insists that *Chevron Oil* does not enunciate principles of retroactivity; rather, it is merely an exercise of our remedial powers. *Post,* at 219–224. As we explain below, these arguments miss the mark. First, as we today resolve an issue not considered in *Scheiner*, we have neither

unfairly favored the litigants in *Scheiner* nor disfavored the litigants before us now. Second, a review of our decisions shows that we have consistently applied the retroactivity doctrine enunciated in *Chevron Oil* rather than the approach suggested by the dissent. The dissent's recharacterization of our precedents disregards both the theoretical underpinnings of the *Chevron Oil* doctrine and the concerns that led the Court to develop and retain this doctrine. Third, contrary to the dissent's assertion, the Court has never equated its retroactivity principles with remedial principles. Finally, the different functions of our retroactivity doctrine in the criminal and civil spheres lead us to reject the dissent's invitation to abandon our nonretroactivity doctrine in the civil arena as we did in the criminal arena.

The dissent's claim that today's decision is unjust because it treats the taxpayers in this case differently from the taxpayers in *Scheiner, post,* at 211–212, is unpersuasive. The taxpayers in *Scheiner* challenged a state court's ruling on the constitutionality of certain tax statutes; the taxpayers in this case challenge a state court's ruling on the nonretroactivity of a decision of this Court. This Court has done nothing more than resolve the separate issues raised by each case.

In *Scheiner,* the Court reversed the judgment of the Supreme Court of Pennsylvania which had upheld the constitutionality of two Pennsylvania tax statutes. After we "decided the constitutional issue presented to us," 483 U. S., at 298, we then remanded the case to the Pennsylvania Supreme Court "to consider whether our ruling should be applied retroactively and to decide other remedial issues." *Id.,* at 297. We did not decide any issues of retroactivity or relief; nor did our decision guarantee the taxpayers that the state court would retroactively apply the Court's decision or provide any particular relief. On remand of *Scheiner,* the Pennsylvania Supreme Court was free to consider the issue of retroactivity just as the Arkansas state court did in this case.

As the Arkansas Supreme Court has already passed on the question whether the Arkansas tax statutes are unconstitutional, that issue is not before us. Petitioners' claim here involves the second, distinct issue of the retroactivity of *Scheiner*. In the civil arena, we have generally considered the question of retroactivity to be a separate problem, one that need not be resolved in the law-changing decision itself. See, *e. g., Consolidated Foods Corp.* v. *Unger*, 456 U. S. 1002, 1003 (1982) (BLACKMUN, J., concurring) (Court properly vacated and remanded a case for consideration in light of *Kremer* v. *Chemical Construction Corp.*, 456 U. S. 461 (1982), but on remand, "respondent will be free to argue that *Kremer* should not apply retroactively"); *Simpson* v. *Union Oil Co. of Cal.*, 377 U. S. 13, 24–25 (1964) (reserving the question whether prospective-only application of the rule announced in that opinion might be warranted). Thus, we had no obligation to consider the retroactivity of *Scheiner* in that case. Today we consider and resolve that issue, which has been properly raised and presented in this case.

The dissent's claim that this Court has consistently applied new decisions retroactively to civil cases which are pending on direct review is an inaccurate characterization of our cases. In fact, it is little more than a proposal that we *sub silentio* overrule *Chevron Oil*. The theory of retroactivity identified by the dissent was formulated in Justice Harlan's concurrence in *United States* v. *Estate of Donnelly*, 397 U. S. 286, 295–297 (1970). *Post*, at 214–215. Justice Harlan urged the Court to adopt a rule that a new decision would always apply to parties in cases pending on direct review unless "the transaction is beyond challenge either because the statute of limitations has run or the rights of the parties have been fixed by litigation and have become *res judicata.*" 397 U. S., at 296. Presumably, this rule of retroactivity would also constrain the lower courts. See *Griffith* v. *Kentucky*, 479 U. S., at 323 ("As a practical matter, of course, we cannot hear each case pending on direct review and apply the

new rule. But we fulfill our judicial responsibility by instructing the lower courts to apply the new rule retroactively to cases not yet final"). If the dissent's approach had prevailed in the civil arena, no retroactivity question would ever arise: A court would only have to determine whether a case was properly before it and, if so, apply current law. However, a review of our civil decisions reveals that this Court has followed a different approach in determining when to apply decisions prospectively only.

The principles underlying the Court's civil retroactivity doctrine can be distilled from both criminal and civil cases considering this issue. When the Court concludes that a law-changing decision should not be applied retroactively, its decision is usually based on its perception that such application would have a harsh and disruptive effect on those who relied on prior law. See, *e. g.*, *Chevron Oil*, 404 U. S., at 107. In order to protect such reliance interests, the Court first identifies and defines the operative conduct or events that would be affected by the new decision. Lower courts considering the applicability of the new decision to pending cases are then instructed as follows: If the operative conduct or events occurred before the law-changing decision, a court should apply the law prevailing at the time of the conduct. If the operative conduct or events occurred after the decision, so that any reliance on old precedent would be unjustified, a court should apply the new law. See generally Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N. Y. U. L. Rev. 631 (1967) (describing this technique).

The Court expressly relied on this doctrine in a criminal case, *Jenkins* v. *Delaware*, 395 U. S. 213 (1969). As the Court observed, a number of decisions prior to *Jenkins* had declined to apply a new rule retroactively when the "point of initial reliance," that is, "the point at which law enforcement officials relied upon practices not yet proscribed," *id.*, at 218–219, n. 7, occurred prior to the date of the law-

changing decision. See, *e. g., Halliday* v. *United States,* 394 U. S. 831, 831 (1969) (new rule not applicable to guilty pleas accepted before date of law-changing decision); *Desist* v. *United States,* 394 U. S. 244, 254 (1969) (new rule not applicable to electronic surveillances conducted before date of law-changing decision); *Fuller* v. *Alaska,* 393 U. S. 80 (1968) (new rule not applicable to tainted evidence introduced before date of law-changing decision). *Jenkins* concluded that "'focusing attention on the element of reliance'" in making nonretroactivity decisions was "more consistent with the fundamental justification for not applying newly enunciated constitutional principles retroactively." 395 U. S., at 219, n. 7, quoting Schaefer, *supra,* at 646.

The Court has relied on the same reasoning in the civil arena. In decisions invalidating state election provisions, the Court has focused on the conduct or events that should not be invalidated by its law-changing decisions. In *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), for example, the Court struck down Louisiana's provisions for bond-authorization elections as violative of the Equal Protection Clause. However, to avoid frustrating the expectations of parties who relied on prior law, the Court held that courts should not invalidate a State's election or bonds if the bond authorization process had been completed, *i. e.,* if the election had not been timely challenged under state law and the bonds were ready to be issued, before the date of the decision in *Cipriano.* See *id.,* at 706 ("[W]e will apply our decision in this case prospectively. That is, we will apply it only where, under state law, the time for challenging the election result has not expired, or in cases brought within the time specified by state law for challenging the election and which are not yet final. *Thus, the decision will not apply where the authorization to issue the securities is legally complete on the date of this decision*" (emphasis added)). Although the Court looked to the state limitations period to determine when the authorization process was complete, the Court did not hold that this period

should be adopted as a time bar for raising equal protection challenges to state elections in federal court. Rather, the Court only held that bonds ready for issuance prior to the date of *Cipriano* could not be invalidated under the rule established in that decision. Similarly, in *Phoenix* v. *Kolodziejski*, 399 U. S., at 213–215, the Court held that its ruling that the state election laws at issue were unconstitutional should not be applied retroactively where the bond authorization process had been completed prior to the date of the Court's decision. See *id.*, at 214 ("[O]ur decision in this case will apply only to authorizations for general obligations bonds that are not final as of June 23, 1970, the date of this decision"). See also *Hill* v. *Stone*, 421 U. S. 289, 301–302 (1975) (holding that the law-changing decision should not apply where the authorization to issue securities became final prior to the date of the decision).

The Court's practice of focusing on the operative conduct or events is implicit in our other retroactivity decisions. In *England* v. *Louisiana State Bd. of Medical Examiners*, 375 U. S. 411 (1964), the Court established a new rule that a party remitted to the state courts by a district court's abstention order could not subsequently return to the district court if he had voluntarily litigated his federal claims in state court. The Court did not apply this rule to the case pending before it, because the individuals there had relied on prior law in litigating their federal claims in state court. *Id.*, at 422. In *Allen* v. *State Bd. of Elections*, 393 U. S., at 571–572, the Court declined to set aside elections conducted pursuant to invalid election laws, as the operative event—the elections—had been valid under law preceding the decision in *Allen*. When considering the retroactive applicability of decisions newly defining statutes of limitations, the Court has focused on the action taken in reliance on the old limitation period—usually, the filing of an action. Where a litigant filed a claim that would have been timely under the prior limitation period, the Court has held that the new statute of

limitations would not bar his suit. See *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604, 608–609 (1987); *Chevron Oil*, 404 U. S., at 107–109.

As these cases indicate, the Court has not followed the dissent's approach in the civil sphere. In none of the cases discussed above did the Court indicate that the critical factor for determining the retroactive applicability of a decision was the time when principles of res judicata or a time bar precluded further litigation. Rather, the Court's retroactivity doctrine obliged courts to apply old law to litigants before them if the operative conduct or events had occurred prior to the new decision. In this case, we merely apply these well-established principles of civil retroactivity. Here, we define the operative conduct as Arkansas' flat taxation of highway use in reliance on this Court's pre-*Scheiner* cases. *Supra*, at 186–187. We then decline to apply *Scheiner* retroactively to invalidate taxation on highway use prior to the date of that decision.

In striving to recharacterize our precedents, the dissent makes the error of equating a decision not to apply a rule retroactively with the judicial choice of a remedy. *Post*, at 219–220. As the Court makes plain in *McKesson*, there is an important difference. Once a constitutional decision applies and renders a state tax invalid, due process, not equitable considerations, will generally dictate the scope of relief offered. Nor do this Court's retroactivity decisions, whether in the civil or criminal sphere, support the dissent's assertion that our retroactivity doctrine is a remedial principle. Indeed, *Lemon II*, 411 U. S. 192 (1973), specifically recognized that the Court's principles of retroactivity were helpful, but not controlling, in deciding the scope of a federal remedy:

> "Those guidelines [expressed in *Linkletter* v. *Walker*, 381 U. S. 681 (1965), for applying our retroactivity doctrine] are helpful, but the problem of *Linkletter* and its progeny is not precisely the same as that now before us. Here, we are not considering whether we will apply a new constitutional rule of criminal law in reviewing judg-

ments of conviction obtained under a prior standard; the problem of the instant case is essentially one relating to the appropriate scope of federal equitable remedies, a problem arising from enforcement of a state statute during the period before it had been declared unconstitutional. True, the temporal scope of the injunction has brought the parties back to this Court, and their dispute calls into play values not unlike those underlying *Linkletter* and its progeny. But however we state the issue, the fact remains that we are asked to reexamine the District Court's evaluation of the proper means of implementing an equitable decree." *Id.*, at 199–200 (opinion of Burger, C. J.) (citation omitted).

While application of the principles of retroactivity may have remedial effects, they are not themselves remedial principles. Any judicial decision will affect the relief available to one of the parties before the court; even an evidentiary ruling may have some remedial effect. However, rules regarding retroactivity, like decisions regarding the mechanics of procedure, are distinct from remedial decisions which govern what a court "may do *for* the plaintiff and conversely what it can do *to* the defendant." K. York, J. Bauman, & D. Rendleman, Remedies 1 (4th ed. 1985); see also D. Dobbs, Law of Remedies 3 (1973) ("The substantive questions whether the plaintiff has any right or the defendant has any duty, and if so what it is, are very different questions from the remedial questions whether this remedy or that is preferred, and what the measure of the remedy is"). A decision defining the operative conduct or events that will be adjudicated under old law does not, in itself, specify an appropriate remedy.

Especially in light of today's holding in *McKesson*, the dissent's view that the doctrine of civil retroactivity is a remedial principle would surprise the many commentators,[2] ap-

---

[2] See, *e. g.*, Corr, Retroactivity: A Study in Supreme Court Doctrine "As Applied," 61 N. C. L. Rev. 745 (1983); Traynor, Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility, 28 Hastings L. J.

pellate courts, see Note, Confusion in Federal Courts: Application of the *Chevron* Test in Retroactive-Prospective Decisions, 1985 U. Ill. L. Rev. 117, 128–136, and state courts that have considered *Chevron Oil* to be exactly what this Court has always understood it to be: a doctrine or set of rules for determining when past precedent should be applied to a case before the court. As such, *Chevron Oil* is better understood as part of the doctrine of *stare decisis*, rather than as part of the law of remedies. This is how nonretroactivity was first characterized by Justice Cardozo in *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358 (1932). Considering a state court's power to apply its own decisions prospectively only, Justice Cardozo asserted:

> "We have no occasion to consider whether this division in time of the effects of a decision is a sound or an unsound application of the doctrine of *stare decisis* as known to the common law. Sound or unsound, there is involved in it no denial of a right protected by the federal constitution. . . . A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions." *Id.*, at 364.

See also *United States* v. *Estate of Donnelly*, 397 U. S., at 295 (Harlan, J., concurring). In those relatively rare circumstances where established precedent is overruled, the doctrine of nonretroactivity allows a court to adhere to past precedent in a limited number of cases, in order to avoid "jolting the expectations of parties to a transaction." *Ibid.* See also JUSTICE SCALIA's opinion concurring in the judgment, *post*, at 204–205. Although JUSTICE SCALIA declines

---

533 (1977); Beytagh, Ten Years of Non-Retroactivity: A Critique and a Proposal, 61 Va. L. Rev. 1557 (1975); Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N. Y. U. L. Rev. 631 (1967).

to rely on our doctrine of nonretroactivity, his understanding of *stare decisis* leads him to conclude that a judge who disagrees with a decision overruling prior precedent must vote to uphold the validity of "action taken [in reliance on that precedent] before the overruling occurred." *Post*, at 205. As Justice Cardozo discerned, prospective overruling allows courts to respect the principle of *stare decisis* even when they are impelled to change the law in light of new understanding.

In proposing that we extend the retroactivity doctrine recently adopted in the criminal sphere to our civil cases, the dissent assumes that the Court's reasons for adopting a *per se* rule of retroactivity in *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), are equally applicable in the civil context. But there are important distinctions between the retroactive application of civil and criminal decisions that make the *Griffith* rationale far less compelling in the civil sphere.

In adopting a *per se* rule of retroactivity for criminal cases, *Griffith* relied on what, in essence, was a single justification: that it was unfair to apply different rules of criminal procedure to two defendants whose cases were pending on direct review at the same time. See *id.*, at 322–323. In expounding this theory, the Court did not explain why the pendency of a defendant's case on direct review was the critical factor for determining the applicability of new decisions. It is at least arguable, as JUSTICE WHITE pointed out in dissent, that the speed at which cases proceed through the criminal justice system should not be the key factor for determining whether "otherwise identically situated defendants may be subject to different constitutional rules." *Id.*, at 331 (internal quotation marks omitted). Nor did the Court consider whether the reliance interests of law enforcement officials would make the retroactive application of new decisions inequitable, although this factor had been a key consideration in prior cases. See, *e. g.*, *Jenkins* v. *Delaware*, 395 U. S., at 220; *Stovall* v. *Denno*, 388 U. S. 293, 299–301 (1967). In focusing solely on the pendency of a case before the court

rather than on the reliance interests of either the defendant or the government, *Griffith* implicitly rejected the rationale of our prior retroactivity doctrine: that new decisions should not be applied retroactively so as to frustrate the expectations of parties who had justifiably relied on prior law.

The Court's analysis in *Griffith* must be understood in context. During the period in which much of our retroactivity doctrine evolved, most of the Court's new rules of criminal procedure had expanded the protections available to criminal defendants. See generally Beytagh, *supra*, n. 2. Therefore, whenever the Court determined that retroactive application of a new rule would be inequitable, the Court was, in effect, according the government's reliance interests more weight than the defendant's interests in receiving the benefit of the rule. See, *e. g., United States* v. *United States Coin & Currency*, 401 U. S. 715, 726 (1971) (BRENNAN, J., concurring) ("[W]hen a new procedural rule has cast no substantial doubt upon the reliability of determinations of guilt in criminal cases, we have denied the rule retroactive effect where a contrary decision would 'impose a substantial burden . . . upon the . . . judicial system . . .'") (quoting *Williams* v. *United States*, 401 U. S. 646, 664 (1971)). *Griffith*'s adoption of a *per se* rule of retroactivity can thus be understood as a rejection of this approach in favor of providing expanded procedural protections to criminal defendants. Under this new theory, any defendant whose conviction had not yet become final should be given the benefit of a new decision regardless of the additional burden this might place on law enforcement authorities.

There are no analogous reasons for adopting a *per se* rule of retroactivity in the civil context. Either party before a court may benefit from the application of the *Chevron Oil* rule. New decisions are not likely to favor civil defendants over civil plaintiffs; nor is there any policy reason for protecting one class of litigants over another. Moreover, even a party who is deprived of the full retroactive benefit of a new

decision may receive some relief. In this case, for example, petitioners are benefited by the prospective invalidation of the Arkansas tax and a ruling that *Scheiner* is applicable to taxation of highway use after the date of decision in that case. The criminal defendant, on the other hand, is generally interested in only one remedy: the reversal of his conviction. The prospective invalidation of a rule relied on in securing his conviction will not assist the criminal defendant in any way. Nor does *Griffith*'s criticism that nonretroactivity gives the benefit of a new rule to a "chance beneficiary" but then "permit[s] a stream of similar cases subsequently to flow by unaffected by that new rule," 479 U. S., at 323 (citation omitted), have force in the civil context. Although the dissent echoes this criticism, *post*, at 211–212, it may fairly be aimed only at those cases in which the Court reversed the conviction of the defendant in the law-changing decision and later determined that the rule would not be applicable retroactively, see, *e. g.*, *Desist* v. *United States*, 394 U. S., at 254–255, n. 24; *Stovall* v. *Denno, supra*, at 300–301. The dissent has failed to cite a single civil case in which comparable inequitable treatment has occurred. In this case, for example, the Court did not provide a benefit to the litigants in *Scheiner* that was denied the petitioners here. See *supra*, at 188–190. Contrary to the dissent's assertions, *post*, at 211–212, our use of the civil retroactivity principles does not result in the unequal treatment of similarly situated litigants. As *Chevron Oil* makes clear, the purpose of the doctrine is to avoid " 'injustice or hardship' " to civil litigants who have justifiably relied on prior law. 404 U. S., at 107 (quoting *Cipriano* v. *City of Houma*, 395 U. S., at 706). In light of this aim, two parties are similarly situated if both relied on the old law before the date of the law-changing decision. A litigant who has not relied on the old law is not similarly situated in a relevant way to one who has, regardless of whether both cases are pending on direct review.

As *Griffith*'s rationale is unpersuasive in the civil context, we see no reason to abandon the *Chevron Oil* test. The Con-

stitution does not prohibit the application of decisions prospectively only, see, *e. g.*, *Solem* v. *Stumes*, 465 U. S. 638, 642 (1984); *Williams* v. *United States*, *supra*, at 651 (opinion of WHITE, J.); nor has this Court ever held that nonretroactivity violates the Article III requirement that this Court adjudicate only cases or controversies. Compare *Stovall* v. *Denno*, 388 U. S., at 301, with *Linkletter* v. *Walker*, 381 U. S., at 622, n. 3, and *Desist* v. *United States*, *supra*, at 256 (Douglas, J., dissenting). The utility of our retroactivity doctrine in cushioning the sometimes inequitable and disruptive effects of law-changing decisions is clear. The "inequities" the dissent alleges are caused by the doctrine are illusory. For these reasons, we decline the dissent's invitation to abandon our longstanding precedent.

Accordingly, in all respects apart from its disposition of 1987–1988 HUE tax payments, we affirm the judgment of the Arkansas Supreme Court.[3]

We are not, however, in a position to determine precisely the nature and extent of the relief to which petitioners are entitled for their 1987–1988 HUE tax payments. That determination, as we have already observed, lies with the state courts in the first instance. We therefore reverse and remand this aspect of the case to the Arkansas Supreme Court in order to permit it to determine the appropriate relief, not inconsistent with our decision today in *McKesson*, for petitioners' payment of 1987–1988 HUE taxes whether made before or after the date of our *Scheiner* decision.

*So ordered.*

JUSTICE SCALIA, concurring in the judgment.

I agree with JUSTICE O'CONNOR that Arkansas should not be held to have violated the Constitution in imposing its Arkansas Highway Use Equalization Tax (HUE) before our decision in *American Trucking Assns., Inc.* v. *Scheiner*, 483

---

[3] As we state in *McKesson*, *ante*, at 29–31, the Court's appellate jurisdiction in a case such as this one is not barred by the Eleventh Amendment.

U. S. 266 (1987), yet should be held to have violated the Constitution in imposing that tax after *Scheiner* was announced. My reasons, however, diverge from hers in a fundamental way, which requires some explanation.

I share JUSTICE STEVENS' perception that prospective decisionmaking is incompatible with the judicial role, which is to say what the law is, not to prescribe what it shall be. The very framing of the issue that we purport to decide today—whether our decision in *Scheiner* shall "apply" retroactively—presupposes a view of our decisions as *creating* the law, as opposed to *declaring* what the law already is. Such a view is contrary to that understanding of "the judicial Power," U. S. Const., Art. III, §1, which is not only the common and traditional one, but which is the only one that can justify courts in denying force and effect to the unconstitutional enactments of duly elected legislatures, see *Marbury* v. *Madison*, 1 Cranch 137 (1803)—the very exercise of judicial power asserted in *Scheiner*. To hold a governmental Act to be unconstitutional is not to announce that *we* forbid it, but that the *Constitution* forbids it; and when, as in this case, the constitutionality of a state statute is placed in issue, the question is not whether some decision of ours "applies" in the way that a law applies; the question is whether the Constitution, as interpreted in that decision, invalidates the statute. Since the Constitution does not change from year to year; since it does not conform to our decisions, but our decisions are supposed to conform to it; the notion that our interpretation of the Constitution in a particular decision could take prospective form does not make sense. Either enforcement of the statute at issue in *Scheiner* (which occurred before our decision there) was unconstitutional, or it was not; if it was, then so is enforcement of all identical statutes in other States, whether occurring before or after our decision; and if it was not, then *Scheiner* was wrong, and the issue of whether to "apply" that decision needs no further attention.

I dissented in *Scheiner,* and in that case and elsewhere have registered my disagreement with the so-called "negative" Commerce Clause jurisprudence of which it is but one, typically destabilizing, instance. See *Scheiner, supra,* at 303–306 (SCALIA, J., dissenting); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue,* 483 U. S. 232, 259–265 (1987) (SCALIA, J., concurring in part and dissenting in part). This disagreement rests on more than my view (by no means mine alone) that that jurisprudence is a "'quagmire,'" *id.,* at 259, quoting *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 458 (1959), that it has been "'arbitrary, conclusory, and irreconcilable with the constitutional text,'" since its inception in the last century, 483 U. S., at 260, n. 3, quoting D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 234 (1985), and that it has only worsened with age. I believe that this jurisprudence takes us, self-consciously and avowedly, beyond the judicial role itself. The text from which we take our authority to act in this field provides only that "Congress shall have Power . . . To regulate Commerce . . . among the several States," U. S. Const., Art. I, § 8, cl. 3. It is nothing more than a grant of power to Congress, not the courts; and that grant to Congress cannot be read as being exclusive of the States, as even a casual comparison with other provisions of Article I will reveal. See *Tyler Pipe Industries, supra,* at 261. The Commerce Clause, therefore, may properly be thought to prohibit state regulation of commerce only indirectly—that is, to the extent that Congress' exercise of its Commerce Clause powers pre-empts state legislation under the Supremacy Clause, Art. VI, cl. 2. When we prohibit a certain form of state regulation that does not conflict with any federal statute, we are saying, in effect, that we presume from Congress' silence that, in the exercise of its commerce-regulating function, it means to prohibit state regulation. 483 U. S., at 262–263. There is no other way to explain how state legislation that would (according to

our "negative" Commerce Clause jurisprudence) violate the Constitution can nonetheless be authorized by a federal statute if Congress "disagree[s]" with our appraisal of the appropriate role of the States in the relevant field. See *Scheiner*, *supra*, at 289, n. 23.

Presuming law from congressional silence is quite different from the normal judicial task of interpreting and applying text or determining and applying common-law tradition. The principal question to be asked, of course, is what would a reasonable federal regulator of commerce intend—which is no different from the question a legislator himself must ask. That explains, I think, why no body of our decisional law has changed as regularly as our "negative" Commerce Clause jurisprudence. Change is almost its natural state, as it is the natural state of legislation in a constantly changing national economy. That also explains why our exercise of the "negative" Commerce Clause function has ultimately cast us in the essentially legislative role of weighing the imponderable— balancing the importance of the State's interest in this or that (an importance that different citizens would assess differently) against the degree of impairment of commerce. See, *e. g.*, *CTS Corp.* v. *Dynamics Corp. of America*, 481 U. S. 69, 89–94 (1987); *Edgar* v. *MITE Corp.*, 457 U. S. 624 (1982); *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970). The "negative" Commerce Clause is inherently unpredictable—unpredictable not just because we have applied its standards poorly or inconsistently, but because it requires us and the lower courts to accommodate, like a legislature, the inevitably shifting variables of a national economy. Whatever it is that we are expounding in this area, it is not a Constitution.

Because our "negative" Commerce Clause jurisprudence is inherently unstable, it will repeatedly result in the upsetting of settled expectations. My fellow dissenters in *Scheiner* seek to avoid this consequence in the present case—or, more precisely, seek to avoid extending this consequence beyond

the unfortunate State before the Court in *Scheiner*, to all other States that had similar laws—by embracing a rule of prospective decisionmaking. There is some appeal to that approach in the "negative" Commerce Clause field: If we are making essentially legislative judgments, why not make them in legislative fashion, *i. e.*, prospectively (subject, of course, to the limitation of the case-or-controversy requirement of Article III, § 2, cl. 1, which surely requires retroactivity with respect to the parties immediately before the Court)? I decline to adopt that solution because, as I have discussed above, such a mode of action is fundamentally beyond judicial power—and although "negative" Commerce Clause decisionmaking is as well, two wrongs do not make a right.

But it does not follow that I must conclude that the pre-*Scheiner* Arkansas HUE taxes were unconstitutional. Given my disagreement with this Court's "negative" Commerce Clause jurisprudence, the only thing that could possibly lead me to such a conclusion would be *Scheiner*'s status as precedent. Although I will not apply "negative" Commerce Clause decisional theories to new matters coming before us, *stare decisis*—that is to say, a respect for the needs of stability in our legal system—would normally cause me to adhere to a decision of this Court already rendered as to the unconstitutionality of a particular type of state law. The law here is indistinguishable from that in *Scheiner*, so I would normally suppress my earlier view of the matter and acquiesce in the Court's opinion that it is unconstitutional. Something is wrong, however, if I must take that position with respect to the pre-*Scheiner* taxes at issue in the present case. Believing that Arkansas was fully entitled to impose the taxes, I would nonetheless make the fifth vote to penalize it for having done so even during the period (pre-*Scheiner*) when our opinions announced it could lawfully do so—and I would impose this injustice in the name of *stare decisis*, that is, in the interest of protecting settled expectations. That would be

absurd. Though I do not believe I have the option of suspending the principle of retroactive judicial decisionmaking, the doctrine of *stare decisis* is a flexible command. I do not think that a sensible understanding of it requires me to vote contrary to my view of the law where such a vote would not only impose upon a litigant liability I think to be wrong, *but would also upset that litigant's settled expectations* because the earlier decision for which *stare decisis* effect is claimed *(Scheiner)* overruled prior law. That would turn the doctrine of *stare decisis* against the very purpose for which it exists. I think it appropriate, in other words—indeed, I think it necessary—for a judge whose view of the law causes him to dissent from an overruling to persist in that position (at least where his vote is necessary to the disposition of the case) with respect to action taken before the overruling occurred.

Accordingly, I would affirm the decision below with respect to Arkansas' HUE taxes imposed pre-*Scheiner*, because in my view they were constitutional. I would reverse the decision below with respect to Arkansas' HUE taxes imposed post-*Scheiner* because they were unlawful by virtue of that decision. I thus concur in the judgment of the Court.

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

This case presents two issues: whether the flat tax features of the Arkansas HUE tax violate the Commerce Clause of the Federal Constitution and, if so, whether petitioners are entitled to a tax refund. The former is ordinarily a pure question of federal law, our resolution of which should be applied uniformly throughout the Nation, while the latter is a mixed question of state and federal law. The plurality today, however, inverts that analysis. With deceptive simplicity, the plurality rules that the constitutionality *vel non* of the flat tax turns on whether state officials in a particular State could have anticipated that such a tax would violate the Constitu-

tion, *ante*, at 181–182,[1] but that the availability of a refund, even if otherwise required under state law, *ante*, at 177, rests on our own determination, as a matter of federal law, whether retrospective relief would threaten a disruption of governmental operations. *Ante*, at 185–186. That analysis is wrong on both counts. Petitioners are entitled to an adjudication of the constitutionality of the Arkansas tax under our best *current* understanding of federal law regardless of the good faith of the Arkansas legislators. The question of remedy or refund, on the other hand, addressed today in *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Fla., ante*, p. 18, should be decided, not by us, but by the state court in the first instance.[2] The plurality's contrary conclusion is supported by nothing more than a misreading of the Court's opinion in *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971).

I

Arkansas enacted the Highway Use Equalization Tax Act (HUE), 1983 Ark. Gen. Acts, No. 685, Ark. Code Ann. §§ 27–35–204, 27–35–205 (1987), in March 1983. The Act, which became effective on July 1, 1983, discriminated against interstate carriers by taxing them at a higher effective tax rate than carriers which operated intrastate. Vehicles of the weight class covered by the Act were required to display a certificate evidencing compliance with the tax. Operation of

---

[1] JUSTICE SCALIA, by contrast, agrees that the constitutionality of a state statute must be analyzed in light of our current understanding of the Constitution. *Ante*, at 200–201.

[2] Our opinion today in *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Fla., ante*, at 39–40, makes clear that the Federal Constitution does not *require* the State to refund the entire tax that was unconstitutionally exacted from petitioners, but only to refund the discriminatory portion or otherwise adjust the tax to render it nondiscriminatory. Petitioners do not contend here that they are entitled to any greater relief as a matter of federal law. See Brief for Petitioners 38–39.

a vehicle in violation of the Act subjected the user to criminal sanctions and to a graduated scale of fines. § 27–35–205(k). The Act contained no method for challenging tax assessments or making payment under protest.

On May 27, 1983, before the effective date of the HUE Act, but after some $1,775,000 in tax revenues had been collected,[3] petitioners filed suit in the Pulaski County Chancery Court challenging the constitutionality of the Act under state law and the Commerce Clause of the Federal Constitution, Art. 1, § 8, cl. 3. Arkansas adheres to the common-law rule that taxes voluntarily paid cannot be recovered. See *County of Searcy* v. *Stephenson*, 244 Ark. 54, 424 S. W. 2d 369 (1968); *Brunson* v. *Board of Directors of Crawford County*, 107 Ark. 24, 153 S. W. 828 (1913). Petitioners, however, invoked the Arkansas constitutional provision governing illegal exactions, Ark. Const., Art. 16, § 13, arguing that, as a matter of state law, under the State Supreme Court's recent ruling in *Little Rock* v. *Cash*, 277 Ark. 494, 644 S. W. 2d 229 (1982), cert. denied, 462 U. S. 1111 (1983), taxpayers who paid their taxes after the date of the complaint should "be deemed to have paid their taxes involuntarily." 277 Ark., at 506, 644 S. W. 2d, at 234. Their substantive constitutional claims tracked those that had been raised by truckers to a similar Pennsylvania tax enacted in 1980. See *American Trucking Assns., Inc.* v. *Bloom*, 77 Pa. Commw. 575, 466 A. 2d 755 (1983).

The Chancery Court denied petitioners' motion for a preliminary injunction, concluding that the tax was constitutional. 2 Record 764. After a trial on the merits, the court ruled in the State's favor. In an opinion delivered in April 1986, the State Supreme Court affirmed, holding that the tax was constitutional under our decisions in *Aero Mayflower Transit Co.* v. *Georgia Pub. Serv. Comm'n*, 295 U. S. 285

---

[3] Petitioners do not contend that they are entitled to a tax refund for these taxes which were paid voluntarily prior to the institution of this lawsuit.

(1935), and *Aero Mayflower Transit Co.* v. *Board of Railroad Comm'rs of Mont.*, 332 U. S. 495 (1947). *American Trucking Assn., Inc.* v. *Gray*, 288 Ark. 488, 707 S. W. 2d 759 (1986). Simultaneously, the Pennsylvania Supreme Court reached a similar conclusion with respect to that State's statute. *American Trucking Assns., Inc.* v. *Scheiner*, 510 Pa. 430, 509 A. 2d 838 (1986).

We noted probable jurisdiction in the Pennsylvania case, see *American Trucking Assns., Inc.* v. *Scheiner*, 479 U. S. 947 (1986), and held the Arkansas case pending our decision in *Scheiner*. In June 1987, we reversed the judgment of the State Supreme Court in *Scheiner*, concluding that that court erred in upholding the constitutionality of Pennsylvania's unapportioned marker fee and axle tax. *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 297; see also *id.*, at 298 (O'CONNOR, J., dissenting). We reasoned that the flat taxes violated the Commerce Clause because they "exert[ed] an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather than 'among the several States.'" *Id.*, at 286–287 (quoting U. S. Const., Art. I, §8, cl. 3). We rejected the argument that considerations of *stare decisis* required adherance to a series of cases that appeared to support the flat tax. Insofar as the *Aero Mayflower* cases—the cases upon which the Arkansas Supreme Court had relied—provided authority for the judgment of the Pennsylvania Supreme Court, we held that those precedents could "no longer support the broad proposition . . . that every flat tax for the privilege of using a State's highways must be upheld even if it has a clearly discriminatory effect on commerce by reason of that commerce's interstate character." 483 U. S., at 296. We therefore remanded for consideration of various remedial issues.

Because our resolution of *Scheiner* bore on the constitutionality of the taxes challenged in this case, we remanded it to the Arkansas Supreme Court for reconsideration in light

of that opinion. *American Trucking Assns., Inc.* v. *Gray,* 483 U. S. 1014 (1987). On remand, the Arkansas Supreme Court did *not* reconsider the constitutionality of the taxes assessed prior to *Scheiner.* Rather, it held that, as a matter of federal law, our ruling in *Scheiner* was not retroactive and did not apply to taxes assessed and applied to highway use prior to the date of decision. *American Trucking Assns., Inc.* v. *Gray,* 295 Ark. 43, 746 S. W. 2d 377 (1988). Only as to the taxes assessed *after* the date of *Scheiner,* and indeed after the date of JUSTICE BLACKMUN's order, taxes which the State had continued to collect, did the State Supreme Court hold that petitioners presented a meritorious constitutional challenge. As the plurality today explains, the judgment of the Arkansas Supreme Court constituted a decision that "whatever else Arkansas law might require, petitioners could not receive tax refunds if *Scheiner* is not retroactive under the test of *Chevron Oil.*" *Ante,* at 177. The HUE tax simply was not unlawful until the date of JUSTICE BLACKMUN's order. Under the State Supreme Court's theory, if the State had repealed the statute on the date *Scheiner* was decided, the State would have never violated the Constitution, and petitioners would have never obtained an adjudication that the taxes were unconstitutional.

## II

In numerous civil cases, over the past several decades, we have declined to give "retroactive effect" to decisions announcing "new" rules of law. Those cases, arising from federal court and involving the application of statutes of limitations and the scope of equitable relief, have not required us to distinguish the two senses in which retroactivity may be used. A decision may be denied "*retroactive* effect" in the sense that conduct occurring prior to the date of decision is not judged under current law, or it may be denied "retroactive *effect*" in the sense that independent principles of law limit the relief that a court may provide under current law.

Since, in a case arising from federal court, both the substantive law applicable to a course of conduct and the scope of permissible relief present federal questions, it has been unnecessary to distinguish the two senses of retroactivity.

This case, which comes to us from state court, requires us for the first time to expressly distinguish between retroactivity as a choice-of-law rule and retroactivity as a remedial principle. Whereas in cases arising from federal court both the applicable law and the type of relief are subject to plenary review, in cases from state court our mandate is more limited. See *Fox Film Corp.* v. *Muller*, 296 U. S. 207, 210 (1935); *Murdock* v. *City of Memphis*, 20 Wall. 590 (1875). The decision of a state court on a substantive matter of federal law presents a pure federal question, see *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 345 (1816); a decision as to the appropriate remedy presents a mixed question of state and federal law. Although the Federal Constitution constrains the minimum remedy a State may provide, see *McKesson*, *ante*, p. 18; *Arsenault* v. *Massachusetts*, 393 U. S. 5 (1968); *Chapman* v. *California*, 386 U. S. 18, 21 (1967), and gives this Court authority to review a decision that a particular remedy is constitutionally compelled, see *Delaware* v. *Van Arsdall*, 475 U. S. 673 (1986); *Michigan* v. *Payne*, 412 U. S. 47 (1973),[4] it does not ordinarily limit the State's power to give a decision remedial effect greater than that which a federal court would provide. See, *e. g.*, *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 277, n. 14 (1984); *Los Angeles* v. *Lyons*, 461 U. S. 95, 113 (1983); *Chapman*, 386 U. S., at 48 (Harlan, J., dissenting); *Iowa-Des Moines National Bank* v.

[4] The plurality's assertion to the contrary notwithstanding, see *ante*, at 178, *Payne* does not stand for the expansive proposition that federal law limits the relief a State may provide, but only for the more narrow proposition that a state court's decision that a particular remedy is constitutionally required is itself a federal question. In this case, of course, petitioners complain that the state court erroneously decided that federal law prevented the court from applying its *own* retroactivity and remedial principles.

*Bennett*, 284 U. S. 239 (1931). The remedial effect a decision of federal constitutional law should be given is in the first instance a matter of state law. See *ante*, at 176 (citing *Scheiner*, 483 U. S., at 297–298; *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 251, 253 (1987); *Williams* v. *Vermont*, 472 U. S. 14, 28 (1985); *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S., at 276–277; *Exxon Corp.* v. *Eagerton*, 462 U. S. 176, 196–197 (1983)).

Those principles elucidate the disposition of *Scheiner* and explain why a similar result is appropriate here. In *Scheiner*, we held that a flat tax substantially similar to the Arkansas HUE tax violated the Commerce Clause. That decision resolved the only question then before us—the lawfulness of a flat tax assessed for the years 1980 to 1986. Since no federal constitutional challenge was presented to the state remedy and since the State had not had the opportunity to determine the appropriate relief under federal and state law, we reversed the state court's determination on the merits and remanded the case for it "to consider whether our ruling should be *applied* retroactively and to decide *other remedial issues*." 483 U. S., at 297 (emphasis added). Our disposition left the state court room to apply its own remedy in the first instance but not to avoid the force of our mandate and declare the taxes under challenge constitutional "in the first place." *Ante*, at 182.

A similar disposition is appropriate here. Our judgment in *Scheiner* leaves no doubt that the Arkansas HUE tax is unconstitutional. As JUSTICE BLACKMUN concluded, in ruling on petitioners' application for establishment of an escrow account, the taxes challenged by petitioners are "substantially similar" in effect "to that of the Pennsylvania unapportioned flat taxes invalidated in *Scheiner*," and work "to deter interstate commerce." *American Trucking Assns., Inc.* v. *Gray*, 483 U. S. 1306, 1308–1309 (1987). The State Supreme Court held, and the plurality today acknowledges, that the Arkansas HUE tax, like the Pennsylvania flat taxes, violates the

command of the Commerce Clause by exerting a pressure on interstate businesses to ply their trade within state boundaries.

In my opinion, the Arkansas HUE tax also violated the Constitution before our decision in *Scheiner* and petitioners are entitled to a decision to that effect. Like the taxpayers in *Scheiner* itself, petitioners timely challenged the constitutionality of the state flat tax. Petitioners would have prevailed if the Pennsylvania tax invalidated in the *Scheiner* case had never been enacted, or if that litigation had not reached our Court until after their litigation did. They should not lose simply because we decided *Scheiner* first. In *Scheiner*, we applied our understanding of the Commerce Clause retroactively, reversing the Pennsylvania Supreme Court's judgment that a similar flat highway tax was unconstitutional and remanding the case for further consideration of the remedial issues. 483 U. S., at 297–298. We should follow the same course here. The accidental timing of our decisions in two timely filed and currently pending cases should not, and has not in the past, produced such a difference in the law applicable to the respective litigants.

## III

Fundamental notions of fairness and legal process dictate that the same rules should be applied to all similar cases on direct review. Considerations of finality and the justifiable expectations that have grown up surrounding a rule are ordinarily and properly given expression in our rules of res judicata and *stare decisis*. When the legal rights of parties have been finally determined, principles "'of public policy and of private peace'" dictate that the matter not be open to relitigation every time there is a change in the law. *Federated Department Stores, Inc. v. Moitie,* 452 U. S. 394, 401 (1981) (quoting *Hart Steel Co. v. Railroad Supply Co.,* 244 U. S. 294, 299 (1917)). At the same time, however, when the legal rights of the parties have not been finally deter-

mined by a court of law, "simple justice," 452 U. S., at 401, requires that a rule of law, even a "new" rule, be evenhandedly applied. As JUSTICE BLACKMUN explained in *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), when we endorsed Justice Harlan's views on the subject of retroactivity:

> "In Justice Harlan's view, and now in ours, failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication. First, it is a settled principle that this Court adjudicates only 'cases' and 'controversies.' See U. S. Const., Art. III, § 2. Unlike a legislature, we do not promulgate new rules of constitutional criminal procedure on a broad basis. Rather, the nature of judicial review requires that we adjudicate specific cases, and each case usually becomes the vehicle for announcement of a new rule. But after we have decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review. Justice Harlan observed:
>
> "'If we do not resolve all cases before us on direct review in light of our best understanding of governing constitutional principles, it is difficult to see why we should so adjudicate any case at all. . . . In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review, is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation.' *Mackey* v. *United States*, 401 U. S. [667,] 679 [(1971)] (opinion concurring in judgment).
>
> .      .      .      .      .
>
> "Second, selective application of new rules violates the principle of treating similarly situated defendants the same. See *Desist* v. *United States*, 394 U. S. [244,] 258–259 [(1969)] (Harlan, J., dissenting). As we pointed

out in *United States* v. *Johnson,* the problem with not applying new rules to cases pending on direct review is 'the *actual inequity* that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary' of a new rule.    457 U. S. [537,] 556, n. 16 [(1982)] (emphasis in original).    Although the Court had tolerated this inequity for a time by not applying new rules retroactively to cases on direct review, we noted: 'The time for toleration has come to an end.' *Ibid.*"    *Id.,* at 322–323.

*Griffith* was a criminal case, but the force of its reasoning cannot properly be so limited.    The Court has no more constitutional authority in civil cases than in criminal cases to disregard current law or to treat similarly situated litigants differently.    In both, adherence to legal principle requires that we determine the rights of litigants in accordance with our best current understanding of the law.    That current understanding may include judicial principles of res judicata and *stare decisis* and legislatively prescribed statutes of limitations that protect interests in reliance and repose.    It may also include a law of damages that recognizes reliance interests.    But once a determination has been made that a party is properly before the Court and a new decisional rule properly states the law, interests of repose should play no role in determining the substantive legal rights of parties.    Justice Harlan explained the distinction between retroactivity as a choice-of-law principle and the recognition of reliance as an element of the damages determination after a new principle of law has been applied:

> "The impulse to make a new decisional rule nonretroactive rests, in civil cases at least, upon the same considerations that lie at the core of *stare decisis,* namely to avoid jolting the expectations of parties to a transaction. Yet once the decision to abandon precedent is made, I see no justification for applying principles determined to be wrong, be they constitutional or otherwise, to liti-

gants who are in or may still come to court. The critical factor in determining when a new decisional rule should be applied to a transaction consummated prior to the decision's announcement is, in my view, the point at which the transaction has acquired such a degree of finality that the rights of the parties should be considered frozen. Just as in the criminal field the crucial moment is, for most cases, the time when a conviction has become final, see my *Desist* dissent, *supra,* so in the civil area that moment should be when the transaction is beyond challenge either because the statute of limitations has run or the rights of the parties have been fixed by litigation and have become *res judicata.* Any uncertainty engendered by this approach should, I think, be deemed part of the risks of life.

．　　　　　．　　　　　．　　　　　．　　　　　．

"To the extent that equitable considerations, for example, 'reliance,' are relevant, I would take this into account in the determination of what relief is appropriate in any given case. There are, of course, circumstances when a change in the law will jeopardize an edifice which was reasonably constructed on the foundation of prevailing legal doctrine. Thus, it may be that the law of remedies would permit rescission, for example, but not an award of damages to a party who finds himself able to avoid a once-valid contract under new notions of public policy. Cf. *Simpson* v. *Union Oil Co.,* 377 U. S. 13, 25 (1964). . . . The essential point is that while there is flexibility in the law of remedies, this does not affect the underlying substantive principle that short of a bar of *res judicata* or statute of limitations, courts should apply the prevailing decisional rule to the cases before them." *United States* v. *Estate of Donnelly,* 397 U. S. 286, 295–297 (1970) (concurring opinion).

Until today, we have consistently applied these principles in civil cases where a litigant has challenged the constitution-

ality of a state or local law.[5] In *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), for example, we struck down a Louisiana law which gave only property taxpayers the right to vote in elections called to approve the issuance of revenue bonds by a municipal utility. The Louisiana legislators who enacted the provision had "good reason to suppose," *ante,* at 182, that it was constitutional when it was first adopted in 1880 and reenacted in 1910 and 1921, but a string of subsequent decisions the preceding five Terms had effected a sea change in election law no less substantial than this Court's decisions in *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977), and *Scheiner* effected with respect to the understanding of the Commerce Clause.[6] The good faith of the legislators and the reliance interests of the State, nonetheless, did not convince us that a different rule of constitutional law should be applied to the Louisiana statute than that which we understood to be the rule on the date of decision. Although "retroactive" application of our decision might

---

[5] Indeed, our whole law of qualified immunity is predicated on the assumption that even "new" law decisions apply retroactively. In *Owen* v. *City of Independence,* 445 U. S. 622 (1980), for example, we held a municipality liable for violating principles of due process established, weeks after its conduct, in *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564 (1972), and rejected the municipality's claim to qualified immunity. Our decision in *Owen* is necessarily predicated upon the view that a court should apply the law in effect at the time of decision in considering whether the State has violated the Constitution. Although the plurality is technically correct that *Owen* did not hold that constitutional decisions should always apply "retroactively," *ante,* at 184–185, that case, and the Congress that enacted 42 U. S. C. § 1983, surely did not contemplate that state actors could achieve, through the judicially crafted doctrine of retroactivity, the immunity not only from damages but also from liability denied them on the floors of Congress. Cf. Rudovsky, the Qualified Immunity Doctrine in the Supreme Court: Judicial Activism and the Restriction of Constitutional Rights, 138 U. Pa. L. Rev. 23, 79–80 (1989).

[6] The decisions were *Avery* v. *Midland County,* 390 U. S. 474, 486 (1968); *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, 680 (1966); and *Reynolds* v. *Sims,* 377 U. S. 533, 589 (1964).

produce "'injustice or hardship,'" 395 U. S., at 706 (quoting *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358, 364 (1932)), those concerns were sufficiently protected by holding that, as a matter of federal law, the decision need not apply "where the authorization to issue the securities is legally complete on the date of this decision." 395 U. S., at 706. We ruled that the lower court which had rejected the plaintiff's timely filed challenge was in error and that our decision would apply "where, under state law, the time for challenging the election result has not expired, or in cases brought within the time specified by state law for challenging the election and which are not yet final." *Ibid.*

In *Phoenix* v. *Kolodziejski*, 399 U. S. 204 (1970), over the dissent of Justice Stewart, Justice Harlan, and Chief Justice Burger, the Court invalidated an Arizona statute limiting the franchise to real property taxpayers in elections to authorize general obligation bonds. Again, the legislators would have had little reason to believe that the provisions were unconstitutional when enacted in 1930. JUSTICE WHITE, in a portion of the opinion joined by Justice Harlan, reaffirmed the retroactivity approach of *Cipriano*. The decision would "apply only to authorizations for general obligation bonds that are not final as of . . . the date of this decision." 399 U. S., at 214. Since the plaintiff's challenge was timely filed, the case would apply "retroactively" to her. *Id.*, at 214–215. Moreover, "[i]n the case of States authorizing challenges to bond elections within a definite period, all elections held prior to the date of this decision will not be affected by this decision unless a challenge on the grounds sustained by this decision has been or is brought within the period specified by state law." *Id.*, at 214.[7] See also *Hill* v. *Stone*, 421 U. S. 289, 301–302 (1975).

---

[7] The Court also stated that, as a remedial matter, in States with no well-defined period for challenging bond elections, bonds issued prior to the commencement of an action would not be open to challenge on the basis of its decision. 399 U. S., at 214. Justice Harlan, who joined this portion

Under *Cipriano* and *Kolodziejski*, petitioners are plainly entitled to an adjudication that the Arkansas HUE tax violated the Constitution both before and after our decision in *Scheiner*. Their lawsuit was timely filed and as the case comes to us the assessment of the taxes is not yet final. The evenhanded administration of justice requires that we give them the benefit of the same decisional rule that we applied in favor of the taxpayers in *Scheiner*.

## IV

The plurality rejects this analysis and, by implication, our decisions in *Cipriano* and *Kolodziejski*, and instead applies the approach that we took with respect to federal statutes of limitations in *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971). The plurality states that, "[i]f the operative conduct or events occured before the law-changing decision, a court should apply the law prevailing at the time of the conduct," *ante*, at 191, and that "[e]ither party before a court may benefit from the application of the *Chevron Oil* rule." *Ante*, at 198. The assessment of HUE taxes was constitutional, *ante*, at 182, because at the time it was enacted the state legislators would have had good reason to believe it to be constitutional and, at the time it was collected, state authorities were justified in relying on then-current precedents of the Court. *Ante*, at 181–182.[8] Under the same logic, if the tax was con-

---

of the opinion, did not understand it to express any views contrary to those which he had expressed in *United States* v. *Estate of Donnelly*, 397 U. S. 286, 295 (1970). In addition, as this case comes to us, it is conceded that petitioners' challenge was timely filed pursuant to a state provision for challenging tax payments.

[8] Although the plurality makes much of the potential liability to which the State might be subject under the Due Process Clause or state law, it admits in the end that the "initial duty of determining appropriate relief" lies with the state courts, *ante*, at 176, and that, as the case comes to us, "the burden that the retroactive application of *Scheiner* would place on Arkansas cannot be precisely determined." *Ante*, at 182. In any event, even if the State were to be held liable under the Due Process Clause or

sidered unconstitutional prior to a law-changing decision such as *James* v. *Dravo Contracting Co.*, 302 U. S. 134 (1937), or *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977), presumably the State would still be held liable even though, under our better understanding of the Constitution, its conduct was entirely lawful. If the plurality's proffered distinction of *Griffith* is to be accepted, the same retroactivity rules must apply to civil defendants as apply to civil plaintiffs. *Ante*, at 198–199.

The plurality's sole support for this anomalous approach— that the law applicable to a particular case is that law which the parties believe in good faith to be applicable to the case— is citation to a single footnote in *Griffith* that states that "the area of civil retroactivity . . . continues to be governed by the standard announced in *Chevron Oil Co.* v. *Huson*, 404 U. S. 97, 106–107 (1971)." 479 U. S., at 322, n. 8.[9] The footnote in *Griffith*, however, does not support the majority's reading.[10] Close examination of *Chevron Oil* and its progeny re-

state law, the plurality should not absolve the State of that liability through the backdoor of determining its conduct to be lawful.

[9] Although one would not surmise it from the plurality's treatment of the issue, the applicability of *Chevron Oil* has been challenged both by the parties, see Brief for Petitioners 12; Brief for Respondents 23–24, and by *amici* on both sides of the case, see, *e. g.*, Brief for National Conference of State Legislatures et al. as *Amici Curiae* 6, 11; Brief for National Private Truck Council, Inc., as *Amicus Curiae* 6.

[10] Nor do *Chapman* v. *California*, 386 U. S. 18 (1967), *Michigan* v. *Payne*, 412 U. S. 47 (1973), and *Arsenault* v. *Massachusetts*, 393 U. S. 5 (1968), provide any support for the plurality's approach. *Chapman* involved a remedy for a constitutional violation and thus undermines, rather than supports, the plurality's analysis. What we said presented a federal question in the passage quoted incompletely by the plurality, *ante*, at 177–178, was "[w]hether a conviction for a crime should stand when a State has failed to accord federal constitutionally guaranteed rights." 386 U. S., at 21. *Arsenault* presented a similar situation. The state court, under the guise of retroactivity, denied a remedy that was constitutionally required. Finally, in *Payne*, the state court was unclear as to whether a particular remedy was required by the Federal Constitution.

veals that those cases establish a remedial principle for the exercise of equitable discretion by federal courts and not, as the plurality states, a choice-of-law principle applicable to all cases on direct review. *Ante*, at 191.

*Chevron Oil* involved a controversy between two private litigants over application of the statute of limitations for actions under the Outer Continental Shelf Lands Act. At the time the lawsuit was initiated there was a long line of federal-court decisions holding that the admiralty law doctrine of laches applied to personal injury suits under the Act, 404 U. S., at 107, and the defendant did not initially challenge the timeliness of the action. *Id.*, at 99. In those special circumstances, we ruled that our interpretation that the Act did not incorporate the admiralty doctrine would not apply retroactively to bar the plaintiff's suit. Remedial considerations were dispositive to our analysis. We stressed that a court considering the retroactive effect of a decision establishing a new principle of law should consider remedial issues such as the purpose and effect of the rule in question and the inequity imposed by retroactive application, *id.*, at 106–107, and held that "devotion to the underlying purpose of the Lands Act's absorption of state law and a weighing of the equities requires nonretroactive application of the state statute of limitations." *Id.*, at 109; see also *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656, 662–664 (1987) (applying new limitations rule retroactively when there was no previous law on which party was entitled to rely). It would have been most inequitable to have held that the plaintiff had "'slept on his rights'" during a period in which neither he nor the defendant could have known the time limitation that applied to the case. 404 U. S., at 108.

Insofar as the Court in *Chevron Oil* did not apply its interpretation of federal law to the parties before the Court, and affirmed the lower court's decision adopting a contrary understanding of federal law, that case does not even address the problem which is presented by this case, and was ad-

dressed by Justice Harlan, of disparate treatment of similarly situated parties. It is one thing for a court to address issues that are not indispensable to its judgment or to delay the issuance of a judgment;[11] it is quite another for it to refuse to apply reasoning in one case that is necessary to its judgment in a virtually identical case.

More fundamentally, however, *Chevron Oil* involved the application of a statute of limitations, an area over which the federal courts historically have asserted equitable discretion to craft rules of tolling, laches, and waiver. See *Bowen* v. *City of New York*, 476 U. S. 467, 479 (1986); *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385, 398 (1982); *Burnett* v. *New York Central R. Co.*, 380 U. S. 424 (1965); *Braun* v. *Sauerwein*, 10 Wall. 218, 223 (1870) ("It seems, therefore, to be established, that the running of a statute of limitation may be suspended by causes not mentioned in the statute itself"). Statutes of limitations proceed upon the "presumption that claims are extinguished whenever they are not litigated in the proper forum within the prescribed period, and they take away all solid ground of complaint, because they rest on the negligence or *laches* of the party himself," *Hanger* v. *Abbott*, 6 Wall. 532, 538 (1868); when "none of the reasons on which the statute is founded can possibly apply," *id.*, at 539–540, the federal courts have exercised equitable discretion to suspend the running of a limitations period in conformity with the "policy underlying [the] statute of limitations," *Burnett, supra,* at 434. The author of *Chevron Oil* later explained: "[T]he mere fact that a federal statute providing for substan-

---

[11] In that respect, *Chevron Oil Co.* v. *Huson,* 404 U. S. 97 (1971), is one in a line of cases in which the Court has announced new rules for the future only, refusing to apply them even to the parties before the Court. See also *Buckley* v. *Valeo,* 424 U. S. 1, 142–143 (1976); *England* v. *Louisiana State Bd. of Medical Examiners,* 375 U. S. 411, 422 (1964). In *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.,* 458 U. S. 50, 88 (1982), the Court held that its decision should not be applied retroactively, but only in the sense that *judgments* entered prior to the date of decision would not be upset.

tive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose." *American Pipe & Construction Co.* v. *Utah*, 414 U. S. 538, 559 (1974) (Stewart, J.). When the federal courts have no equitable discretion, we have held a federal court has no authority to refuse to apply a law retroactively. See *Firestone Tire & Rubber Co.* v. *Risjord*, 449 U. S. 368, 379 (1981).

The remainder of our "retroactivity" cases fit into a similar mold. In *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604 (1987), we once again recognized that "[t]he usual rule is that federal cases should be decided in accordance with the law existing at the time of decision," *id.*, at 608 (citing *Gulf Offshore Co.* v. *Mobil Oil Corp.*, 453 U. S. 473, 486, n. 16 (1981); *Thorpe* v. *Housing Authority of Durham*, 393 U. S. 268, 281 (1969); *United States* v. *Schooner Peggy*, 1 Cranch 103, 110 (1801)), but found that *Chevron Oil* "counsel[ed] against retroactive application *of statute of limitations decisions* in certain circumstances." 481 U. S., at 608 (emphasis added). Without deciding the correct statute of limitations period ourselves, we held that the respondent's claim was not time barred because it was timely filed under clearly established law in the Circuit. By contrast, in *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656 (1987), we gave retroactive effect to our decision on the statute of limitations for suits under 42 U. S. C. §1981—which overruled clearly established law in the Circuit—because at the time the complaining party brought suit there was no clear Circuit precedent on which it was entitled to rely. 482 U. S., at 662–663. *Saint Francis College* and *Lukens Steel Co.* make clear that *Chevron Oil* does not alter the principle that consummated transactions are analyzed under the best current understanding of the law at the time of decision, but rather establishes a principle particular to the exercise of equitable discretion.

The civil cases upon which *Chevron Oil* relied, *Allen* v. *State Bd. of Elections*, 393 U. S. 544 (1969), *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U. S. 481 (1968), *Reynolds* v. *Sims*, 377 U. S. 533, 585 (1964), and *Simpson* v. *Union Oil Co. of Cal.*, 377 U. S. 13 (1964), as well as those cases which have relied upon it, *Florida* v. *Long*, 487 U. S. 223 (1988), *Arizona Governing Comm. for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073 (1983), and *Lemon* v. *Kurtzman*, 411 U. S. 192 (1973) *(Lemon II)*, have concerned not the application of a new constitutional or statutory rule, *id.*, at 199, but rather the relief that a *federal* court should award when applying the new law.[12]  See also *Caban* v. *Mohammed*, 441 U. S. 380, 416 (1979) (STEVENS, J., dissenting).  These cases are all remedy cases in which, as Justice Harlan explained, consideration of reliance might be appropriate.  See *United*

---

[12] *Chevron Oil* also relied upon the criminal cases that were overruled in *Griffith* v. *Kentucky*, 479 U. S. 314 (1987).  The other civil cases relied on by the Court in *Chevron Oil—Cipriano* v. *City of Houma*, 395 U. S. 701 (1969), *Chicot County Drainage District* v. *Baxter State Bank*, 308 U. S. 371 (1940), *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358 (1932), and the municipal bond cases, *Gelpcke* v. *City of Dubuque*, 1 Wall. 175 (1864); *Havemeyer* v. *Iowa County*, 3 Wall. 294 (1866); and *Railroad Co.* v. *McClure*, 10 Wall. 511 (1871), provide no support for the judgment here.  On *Cipriano*, see *supra*, at 215–217.  As to the other civil cases cited by *Chevron Oil*, Justice Harlan has explained why none of them support the result reached by the Court today:

"*Gelpcke* v. *City of Dubuque*, 1 Wall. 175 (1864), holds only that *state* courts may be *compelled* in some situations by particular provisions of *the Federal Constitution* to apply certain new rules prospectively only. . . . *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358 (1932), merely holds that the Federal Constitution imposes no barrier to a state court's decision to apply a new state common-law rule prospectively only.  Is it not sufficient answer to the dissenters' final assertion of precedential support to point out that *Chicot County Drainage District* v. *Baxter State Bank*, 308 U. S. 371 (1940), was a collateral attack on a civil judgment already otherwise final and entitled to *res judicata* effect?"  *Mackey* v. *United States*, 401 U. S. 667, 698 (1971) (opinion concurring in judgment in part and dissenting in part).

*States* v. *Estate of Donnelly*, 397 U. S., at 296–297 (concurring opinion). As the plurality stated in *Lemon II*, the problem of "the appropriate scope of *federal* equitable remedies" is distinct from the choice-of-law issue implicated by this case. 411 U. S., at 199 (emphasis added). "In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots." *Id.*, at 201; see also *id.*, at 199–200 (citing *Estate of Donnelly*, 397 U. S., at 296–297 (Harlan, J., concurring)).

The Arkansas HUE tax unquestionably violates the Commerce Clause. Two results might follow from that conclusion. If the retention of taxes assessed violates the Due Process Clause under our decision today in *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Fla.*, *ante*, at 36–43, petitioners are entitled to a remedy. The State's freedom to impose various procedural requirements on the refund mechanism sufficiently meets any state interest in sound fiscal planning. *Ante*, at 44–45. If the retention of the taxes does not violate the Due Process Clause, but does violate the state constitutional provision governing illegal exactions, petitioners are entitled to relief as a matter of state law. The State has the right to provide relief for illegally exacted taxes and make its own judgment as to the equities free from this Court's determination that such relief would be unduly burdensome. In either event—whether we think relief from a violation of fundamental fairness to be unfair or the State's choice of remedy unjust to the State—we have no warrant to substitute our judgment for what the Due Process Clause or state law would require.

## V

I would hold that our decision in *Scheiner* need apply only where, under state law, the time for challenging the tax has not expired, or in cases brought within the time specified by

state law for challenging the tax, the decisions are not yet final. The Arkansas Supreme Court did not reach the issue whether a refund remedy was available under state law because of its erroneous view that federal law prevented retroactive application of our decision in *Scheiner* to taxes paid prior to the date of JUSTICE BLACKMUN's escrow order. I would therefore remand the case to the Arkansas Supreme Court for consideration whether petitioners are entitled to relief under state law or under our decision today in *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Fla.,* ante, p. 18.

I respectfully dissent.